IN THE UNITED STATES DISTRICT COURT


FOR THE DISTRICT OF HAWAII


| | |
|---|---|
| JACKI JURA,                                   ) | CIV. NO. 11-00338 SOM/RLP |
|                               ) | |
|         Plaintiff,            ) | |
|                               ) | ORDER GRANTING DEFENDANTS' |
|     vs.                       ) | MOTIONS FOR SUMMARY JUDGMENT |
|                               ) | |
| COUNTY OF MAUI; BENJAMIN M.    ) | |
| ACOB,in his official and      ) | |
| individual capacity; and      ) | |
| MARIE J. KOSGARTEN, in her     ) | |
| official and individual       ) | |
| capacity,                     ) | |
|         Defendants.           ) | |
|                               ) | |
| _____ ) | |


**ORDER GRANTING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION**

On May 8, 2012, Plaintiff Jacki Jura sued her former

employer, the County of Maui; Benjamin M. Acob, in his official

and individual capacities; and Marie J. Kosegarten, in her

official and individual capacities (collectively, "Defendants").

At all times relevant to this lawsuit, Jura was a Deputy

Prosecuting Attorney for the County of Maui, Acob was the Chief

Prosecuting Attorney for the County of Maui, and Kosegarten was

the District Court Supervisor within the Department of the

Prosecuting Attorney for the County of Maui.  See Am. Compl. ¶¶ 2-4, 10, ECF No. 50.

Jura asserts three claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 to -17, against the County: (1) Pregnancy Discrimination, (2) Sex Discrimination/Hostile Work Environment, and (3) Retaliation. Jura also asserts a claim against the County for: (4) Disability Discrimination pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12300.  See Am. Compl. ¶¶ 102-08, 109-34, 135-46, 147-61.  In addition, Jura asserts two state law claims against all Defendants: (5) Discriminatory Practices, and (6) Sexual Harassment/Hostile Work Environment, both pursuant to chapter 378 of the Hawaii Revised Statutes against all Defendants.  See Am. Compl. ¶¶ 162-68, 169-75.  Finally, Jura asserts (7) Libel and/or Slander Per Se against Kosegarten only. See Am. Compl. ¶¶ 176-81.

Defendants now move for summary judgment on all counts. See Acob and County of Maui's Mot. for Summ. J., ECF No. 64; Kosegarten's Mot. for Summ. J., ECF No. 96.  The court grants Defendants summary judgment on all claims.

**II.       BACKGROUND**

Jura is an attorney who suffers from "severe bilateral hearing loss with no hearing in normal ranges."  Am. Compl. ¶ 25; Jacki Jura's Concise Statement in Opp'n to Def.s' Mot.

Summ. J. ("Plaintiff's Facts") ¶ 21, ECF No. 120.   On or about December 1, 2006, Jura began working as a Deputy Prosecuting Attorney in Maui's Department of the Prosecuting Attorney (the "Prosecutor's Office").   Am. Compl. ¶ 10; Decl. of Benjamin Acob ("Acob Decl.") ¶ 3.   Jura was initially assigned to the Appellate Division of the Prosecutor's Office.   Am. Compl. ¶¶ 10-11; Acob Decl. ¶ 4.   She says her supervisor in the Appellate Division was Richard Minatoya, although he denies that.   Declaration of Richard Minatoya ¶ 3, ECF No. 95-2.   Minatoya had such limited interaction with Jura that, when she went on medical leave for problems relating to her pregnancy in January 2007, he "was not aware she was pregnant until after she apparently had a miscarriage."   Id.

Upon Jura's return to work in February 2007, Acob reassigned her to the District Court Division under Kosegarten's supervision.   Acob Decl. ¶ 4.   Jura worked in the District Court Division for approximately ten months before she was terminated. Acob Decl. ¶ 9.   The Prosecutor's Office asserts it terminated Jura in December 2007 because of "severe performance problems." Def.'s Am. Mot. Summ. J., ECF No. 94.   About a month before Jura was fired, Acob, in response to his requests for feedback, heard from at least two Maui District Court judges about Jura as he sought to evaluate the performances of his District Court Deputies.   Acob Decl. ¶ 6.   District Judges Rhonda Loo and Simone

Polak[1] were critical of Jura's work in their courtrooms.  Acob

Decl. ¶ 7.  See also Polak Decl., ECF. No. 95-3; Declaration of

Rhonda I.L. Loo ("Loo Decl."), ECF. No. 95-4.  While Judge Loo

praised Jura as a "bulldog and fighter," she also noted that Jura

"ha[d] difficulty listening and accepting suggestions/advice from

judges." Loo Decl. ¶ 4.  Judge Loo also criticized Jura for

demonstrating "a lack of respect [by] ask[ing] the judge to look

up the statutes/penalties for themselves and blam[ing] others

when she is not prepared." Id.  Judge Polak was even more

critical, describing Jura and her appearances in court as

"torture."  Polak Decl. ¶ 4.

Acob met with Jura on December 6, 2007, to discuss the

judges' complaints.  Acob Decl. ¶ 7.  Jura disputed the judges'

allegations,[2] causing Acob to end their meeting and to contact

Judges Loo and Polak.  Id.  Besides confirming their earlier

reports, both judges offered additional negative feedback.  Acob

Decl. ¶ 8.  Judge Loo recounted having "instructed Ms. Jura to

file complaints in Lanai cases involving three Maui defendants

---

[1]Polak is now employed by the Prosecutor's Office. See Declaration of Simone C. Polak ("Polak Decl.")¶ 1, ECF No. 95.

[2]Jura rejects Polak's complaints as unfounded harping animated by a personal vendetta.  Declaration of Jacki Jura ("Jura Decl.") ¶¶ 67-75, Plaintiff's Facts at Ex. H, ECF No. 119-5.  See also Attach. 1 to Jura's Errata, ECF No. 121-1 (correcting Jura's failure to sign or date her declaration filed as ECF No. 119-5 by including a signed and dated copy of the last page of the Jura Declaration).  Jura admits some of Judge Loo's criticisms were accurate.  Jura Dep., ECF No. 95-13.

who would be appearing on Lanai for Court," but "Ms. Jura did not follow through and [those] defendants made unnecessary trips to Lanai."  Loo Decl. ¶ 5.  Judge Polak told Acob that "Jura had asked a Public Defender what she should do on one of her cases" and "appeared in court wearing slippers."  Polak Decl. ¶ 5.  In addition, Judge Polak informed Acob that "Jura had stated on the record, in a trial she prosecuted and [Polak] presided over, that [Jura] had not understood anything that had happened, because she could not hear what was being said."  Id.  Judge Polak further told Acob that she had ordered Jura "to wear the amplifying headphones available in the courtroom, but she had refused."  Id.  Acob terminated Jura the following day.  Acob Decl. ¶ 9.

Jura alleges that the real reason she was terminated is that she participated in an internal investigation against Kosegarten.  Pl.'s Opp. at 4, ECF No. 119.  The investigation flowed from a complaint made by Deputy Prosecutor Timothy Tate on October 29, 2007, to the person within the Prosecutor's Office assigned to investigate discrimination complaints.  Tate alleged that Kosegarten was harassing Deputy Prosecutor Yukari Murakami because Kosegarten was jealous of Murakami's romantic relationship with Tate.  Jura Decl. ¶¶ 85-91, ECF No. 119-5.  On November 6, 2007, Jura told the investigator that Kosegarten had similarly harassed Jura earlier that year when Kosegarten thought that Jura and Tate were romantically involved.  Id. ¶¶ 95, 99.

Jura asserts that the decision to fire her was reached upon her "confirming the discrimination of Yukari Murakami and confirming that I had been similarly discriminated against when Marie Kosegarten though[t] that I was dating Timothy Tate."  Id. ¶ 100.

Jura asserts unlawful mistreatment by Kosegarten and the Prosecutor's Office in various forms.  First, Jura claims that she was discriminated against because of her pregnancy by "being ignored, reassigned to a less desirable position, and witholding/reducing her pay."  Pl.'s Opp. at 4; Jura Decl. ¶ 8. Second, Jura asserts that the County of Maui, through Kosegarten, "engaged in hostile and abusive conduct directed towards Plaintiff on the basis of her gender that was so severe and pervasive as to alter the conditions of her employment" in violation of state and federal law.  See Pl.'s Opp. at 4.  Third, Jura alleges that the County, Acob, and Kosegarten discriminated against her and aided and abetted her termination in violation of section 378-2 of Hawaii Revised Statutes.  Id.  Fourth, Jura argues that the Prosecutor's Office failed to reasonably accommodate her hearing disability when it did not provide a hearing aid.  Jura Decl. ¶¶ 12-13.  Fifth, Jura claims that, at some unspecified point in time, "Kosegarten made false and defamatory statements that Plaintiff was incompetent at her business or profession that were publicized to third parties." Pl.'s Opp. at 5.

III.        MOTION FOR SUMMARY JUDGMENT

    A.    STANDARD OF REVIEW

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See Celotex, 477 U.S. at 323. A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.

"A fact is material if it could affect the outcome of the suit under the governing substantive law." <u>Miller</u>, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. <u>Nissan Fire</u>, 210 F.3d at 1102-03. On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." <u>Miller</u>, 454 F.3d at 987. This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be

enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

### B.   ANALYSIS

The court analyzes Jura's claims by count number, except that the court combines the discussion of analogous federal and state claims even if asserted in separate counts.

### 1.   Summary Judgment is Granted to Defendants on Jura's Federal and State Pregnancy Discrimination Claims.

Count I alleges that the County discriminated against Jura because of her pregnancy in violation of Title VII. See Am. Compl. ¶¶ 102-108. Count V, which vaguely alleges sex discrimination in violation of chapter 378 of Hawaii Revised Statutes, id. ¶¶ 162-68, may be intended to include a state law analog to Count I. See Haw. Rev. Stat. § 378-2(1)(A)(defining "because of sex" to include "pregnancy, childbirth, [and] related conditions"); § 378-2(1)(stating that discriminatory practices that are unlawful include identified actions taken because of, among other things, sex). Count V is asserted not only against the County but also against Acob and Kosegarten in their official and individual capacities.

Count V appears to allege that the County, Acob, and
Kosegarten directly discriminated against Jura, as well as having
aided and abetted discrimination.  Whether chapter 378 limits
claims that may be brought against co-workers is an issue as to
which there is, as yet, no clear statement by the Hawaii Supreme
Court.  Litigants and courts addressing this issue have relied
on, among other things, analogies to Title VII, under which
claims against individual employees are not allowed.  See Miller
v. Maxwell's Int'l, Inc., 991 F.2d 583, 587-88 (9th Cir.
1993)("Congress did not intend to impose individual liability on
employees. . . .  If Congress decided to protect small entities
with limited resources from liability, it is inconceivable that
Congress intended to allow civil liability to run against
individual employees.").  But there will soon be a definitive
resolution of whether chapter 378, in contrast to Title VII,
allows direct discrimination claims to be brought against
individuals, in addition to the aiding and abetting claims
section 378-2(3) expressly permits to be brought against
individuals.  The Hawaii Supreme Court has just granted a
certiorari petition raising that issue in Lales v. Wholesale
Motors Co., 127 Haw. 412, 279 P.3d 77 (Ct. App.) (unpublished),
cert. granted, SCWC-28516, 2012 WL 4801373 (Haw. Oct. 9, 2012).

The Lales ruling by the Hawaii Intermediate Court of
Appeals held that individual employees could be sued under

section 378-2 both as agents of an employer and for aiding and abetting.  In so ruling, the ICA adopted the reasoning of Judge J. Michael Seabright of this court in <u>Sherez v. Hawaii Department of Education</u>, 396 F. Supp. 2d 1138, 1145 (D. Haw. 2005).  The ICA did not mention that the Ninth Circuit had, in a different case raising the same issue, determined that "there is no individual liability under Hawaii Revised Statutes § 378-2(1)(A) and (2)," notwithstanding the individual liability for aiding and abetting discrimination provided for by section 378-2(3).  <u>See</u> <u>Lum v. Kauai Cnty. Council</u>, 358 Fed. App'x 860, 862 (9th Cir. 2009)(affirming decision in Civ. No. 06-00068 SOM/LEK, 2007 WL 3408003 (D. Haw. Nov. 9, 2007)).

Of course, if the Hawaii Supreme Court affirms the ICA's ruling in <u>Lales</u>, this court will apply the Hawaii Supreme Court's reasoning rather than the Ninth Circuit's in any dispute turning on the applicability of section 378-2 to individual employees.  However, this court need not even reach that issue to decide Jura's pregnancy discrimination claims, because all of Jura's federal and state pregnancy discrimination claims are time-barred.

Recognizing that Title VII and chapter 378 required her to exhaust administrative remedies before bringing her claims to court, <u>see</u> 42 U.S.C. § 2000e-16(c), Haw. Rev. Stat. §368-11(c), Jura filed her pregnancy discrimination claims with the Equal

11

Employment Opportunity Commission and the Hawaii Civil Rights Commission.  Her federal claim had to be filed with the EEOC within 300 days of the alleged discrimination.  <u>See</u> 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.80, 1601.13.  <u>See also Kauila v. Cnty. of Maui</u>, 504 F. Supp. 2d 969, 985 (D. Haw. 2007) (noting that what is otherwise a 180-day limitation period for filing a claim with the EEOC is extended to 300 days if a claimant also files a claim with a state agency that enforces its own discrimination laws).  Her state claim had to be filed with the Hawaii Civil Rights Commission within 180 days.  Haw. Rev. Stat. § 368-11.  Jura filed her claims well beyond the deadlines.

Jura was on medical leave because of pregnancy-related issues from January 18, 2007, until February 5, 2007.  Jura Decl. ¶¶ 6-7.  When she returned to work, Jura learned that she had been transferred from the Appellate Division to the District Court Division.  <u>Id.</u> ¶ 7.  While Acob maintains that "[m]oving a deputy from Appeals to District Court was not a demotion," Acob Decl. ¶ 4, Jura viewed the District Court Division as "less desirable" than the Appellate Division.  Plaintiff's Facts ¶ 2, ECF No. 120.

Jura also complains that the County wrongly docked her pay while she was on medical leave.  Pl.'s Opp. at 6.  Jura submitted an Employee Attendance and Leave Report on or about February 20, 2007, Am. Compl. ¶ 20, and subsequently discovered

that Human Resources had docked her four additional days of pay for weekend days during her sick leave.  Id. ¶ 22.  Defendants argue that Jura knew or should have known the amount of her pay when she received her paycheck for the periods in question. Def.'s Mot. for Summ. J. at 5.  Indeed, Jura received an itemized paycheck for both pay periods spanning her leave, which noted all deductions without pay, no later than February 28, 2007.  See Declaration of Adrienne Kawano ¶¶ 3-4, ECF No. 95-5.  Jura therefore knew or should have known of her paycheck status by February 28, 2007.

Jura filed her pregnancy discrimination claims with the EEOC and the HCRC on January 14, 2008.  See Jura's HCRC and EEOC Charge of Discrimination, ECF No. 95-14.  This was approximately 343 days after Jura had returned to work and been reassigned to the District Court Division, and approximately 320 days after she received her paycheck of February 28, 2007.  All of Jura's pregnancy discrimination claims are therefore barred.  See Kauila, 504 F. Supp. 2d at 985.

Summary judgment on Count I is granted to Defendants. To the extent Count V includes a state law claim for pregnancy discrimination against the County, Acob, and Kosegarten, the court also grants all three Defendants summary judgment on that portion of Count V.

13

2.   **Summary Judgment is Granted to Defendants on Jura's Federal and State Hostile Work Environment Claims.**

Count II alleges that the County subjected Jura to a hostile work environment in violation of Title VII.[3]  Am. Compl. ¶¶ 109-134.  Specifically, Jura alleges that "Defendant County of Maui, through its agent and employee Defendant Marie Kosegarten, engaged in hostile and abusive conduct directed towards Plaintiff on the basis of her gender that was so severe and pervasive as to alter the conditions of her employment."  Pl.'s Opp. at 4.  To the extent Count V includes a state-law hostile work environment claim against the County, Acob, and Kosegarten, this court considers that claim here, along with Count VI, which explicitly asserts a state-law hostile work environment claim against all Defendants.  Am. Compl. ¶¶ 169-75.

Jura fails to show that she has a triable federal or state hostile work environment claim against any Defendant.  To prevail on a hostile work environment claim under Title VII, Jura

---

[3] For reasons that are not clear to this court, the heading to Count II refers to both Title VII and 42 U.S.C. § 1983. Because Jura may sue the County directly under Title VII, the reference to § 1983 is superfluous.  Even if it made sense for Jura to proceed under § 1983, Jura's hostile work environment claim would fail because Jura fails to make the required showing that the County had a policy of sex discrimination or that any person with final policy-making authority inflicted the alleged discrimination against her or ratified such action by another. See Monell v. New York City Dep't of Soc. Serv., 436 U.S. 658, 691 (1978); Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996). While Acob headed the office, Jura does not show that he had final policy-making authority with respect to sex discrimination.

14

must show that her "workplace was permeated with discriminatory intimidation . . . that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923 (9th Cir. 2000)(internal quotation marks and citations omitted).  The court examines the totality of the circumstances to determine whether a claimant shows that her work environment was both subjectively and objectively abusive.  <u>Id.</u>  "When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim."  <u>Id.</u> at 924.

The Hawaii Supreme Court analyzes similar factors in considering hostile work environment claims brought under chapter 378.  <u>See</u> <u>Nelson v. University of Hawaii</u>, 97 Haw. 376, 390, 38 P.3d 95, 109 (2001).  Its "analysis of whether particular harassing conduct was severe and pervasive is separate and distinct from the remaining requirements of a plaintiff's claim: it is the *harasser's conduct* which must be severe or pervasive, not its effect on the plaintiff or the work environment."  <u>Aquero v. Hilton Hawaiian Vill. LLC</u>, 104 Haw. 423,431, 91 P.3d 505, 513 (2004) (internal alterations omitted) (emphasis in original).

Jura complains that her first supervisor, Minatoya, was dismissive of her while she worked in the Appellate Division. She provides no detail suggesting that this had anything to do with her gender.

15

Jura also says that her supervisor after she was transferred to the District Court Division, Kosegarten, repeatedly asked her unwelcome questions.  In particular, Jura alleges that, throughout the summer of 2007, "Kosegarten questioned Plaintiff every three or four days as to whether Plaintiff socialized with Timothy Tate outside the office, and if so, what they did, and/or whether any plan existed for Plaintiff and Timothy Tate to spend time together outside the office and what they planned to do."  Pl.'s Opp. at 7.  Jura says that once Kosegarten learned that Tate had a romantic relationship with Murakami, Kosegarten stopped harassing Jura and "began focusing her attention" on Murakami.  Id. at 14.

Neither Minatoya nor Kosegarten ever made discriminatory remarks about Jura's gender or her pregnancy. Plaintiff's Facts at Ex H. (Jura Dep.) at 66-67, ECF No. 95-13. While Jura characterizes Kosegarten's questions as sexual harassment, Jura admits that "the only thing that upset [Kosegarten] was motivated by her jealousy of . . . anyone who was taking the attention that Tim Tate otherwise bestowed on her."  Id. at 721.

Jura's allegations do not amount to a cognizable Title VII claim.  Title VII is not "a general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  That is, "Title VII does not prohibit

all verbal or physical harassment in the workplace." Id.
Further, workplace harassment, even when "the words used have
sexual content or connotations," is not automatically covered by
Title VII. Id. Rather, "Congress intended that Title VII only
prohibit discrimination based on immutable characteristics
associated with a worker's sex." Jespersen v. Harrah's Operating
Co., Inc., 392 F.3d 1076, 1080 (9th Cir. 2004) (internal
quotations omitted).

For the same reasons, Jura fails to show that she has a
meritorious claim under section 378-2. See Arquero, 104 Haw.
423, 91 P.3d 505. The conduct Jura alleges is not severe and
pervasive. There is thus no need for the court to differentiate
any alleged harasser's conduct from its effect on Jura or her
work environment. See id.

By Jura's own account, Kosegarten's intrusive questions
were directed at Jura only when Kosegarten believed that Jura was
romantically involved with Tate. Once Kosegarten discovered that
Tate was romantically involved with Murakami, however,
Kosegarten's alleged harassment shifted from Jura to Murakami.
The behavior Jura describes was based on a perceived romantic
relationship, not an immutable characteristic associated with
Jura's sex.

As the Eleventh Circuit reasoned, "personal animosity
is not the equivalent of sex discrimination," and a plaintiff

"cannot turn a personal feud into a sex discrimination case." Succar v. Dade Cnty. Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000).  Put differently, a supervisor's jealousy over an employee's suspected relationship with another employee is not the kind of unwelcome attention that Title VII prohibits.  In the context of a Title VII claim, romantic jealousy "provides a neutral explanation for the mistreatment," regardless of whether the explanation is unacceptable on other grounds.  See Cupil v. Potter, 494 F. Supp. 2d 917 (N.D. Ill. 2007).

Even if Jura's allegations could be said to fall within Title VII, Jura fails to allege the necessary facts to establish a meritorious claim.  Viewed objectively, the evidence falls far short of establishing a hostile work environment.  In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court directed courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 787-88 (internal quotation marks omitted).  The Supreme Court concluded that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Id. at 788 (internal quotation marks omitted).

The only Faragher indicator arguably raised by Jura concerns the frequency of Kosegarten's comments, which were allegedly during the summer of 2007.  Jura does not identify a single comment that qualifies as "severe," and none of Kosegarten's comments appear to have been threatening or humiliating.  Kosegarten's inquiries may have been annoying, but they do not appear to have interfered with Jura's performance.  To the contrary, Jura claims that her work performance was "superior" and that she was praised as the "best writer in her section."  Pl.'s Opp. at 13.  On the record before this court, Jura does not show that she was subjected to a hostile work environment based on her sex (as opposed to personal jealousy).

It is not enough for Jura to assert that Kosegarten was jealous of women that Tate was involved with.  Jealousy of specific women does not automatically equate to discrimination prohibited by Title VII.  Otherwise, Title VII could be said to cover all manner of behavior focusing on personal interaction, not hostility against women because they are women.

Even if this court takes Jura's reaction to the alleged harassment into account, the result is the same.  If Minatoya was dismissive, the burden is on Jura to tie his dismissiveness to her gender.  Not only does she fail to do that, she wanted to remain under Minatoya's supervision and was unhappy with her reassignment to the District Court Division.  With respect to

Kosegarten, Jura's own behavior does not suggest that she felt harassed.  With Kosegarten, she usually did provide details about her activities with Tate, only once telling Kosegarten to "knock it off."  See Pl.'s Opp. at 9.  Jura also willingly socialized with Kosegarten on multiple occasions outside of work.  See id. at 8 (Jura invited Kosegarten to stay at her friend's apartment with her over the weekend); 9 (Jura and Kosegarten went golfing together with Tate); and 12 (Jura and Kosegarten had dinner with each other at Jura's invitation).

The court grants the County summary judgment on Count II and grants summary judgment to the County, Acob, and Kosegarten on any portion of Count V asserting a hostile work environment claim and on Count VI.[4]  See Arquero, 104 Haw. 423, 91 P.3d 505.

### 3.  The Court Grants Defendants Summary Judgment on Jura's Disability Discrimination Claims.

Count III alleges that the County violated the Americans with Disabilities Act (the "ADA") by failing to offer Jura "a hearing aid or similar reasonable accommodation."  Am. Compl. ¶ 140.  Count V also alleges that the County, Acob, and

---

[4]This court once again finds it unnecessary to resolve the question of whether only the aiding and abetting claims against Acob and Kosegarten in Counts V and VI are viable under section 378-2.  Because Jura fails to show the existence of a hostile work environment, the scope of any individual liability is irrelevant.

Kosegarten discriminated against her because of her disability in violation of state law.  Id. ¶ 164.

The ADA makes it "unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an . . . employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  29 C.F.R. § 1630.9 (2011).  The Hawaii Supreme Court "has expressly adopted the ADA elements of a prima facie case as the elements of a prima facie H.R.S. § 378-2 case."  Lovell v. United Airlines, Inc., 728 F. Supp. 2d 1096, 1102 (D. Haw. 2010).  See also French v. Hawaii Pizza Hut, Inc., 105 Haw. 462, 467, 99 P.3d 1046, 1051 (2004).

The record does not support Jura's federal or state disability discrimination claims.  To the extent disability discrimination is alleged against Acob and Kosegarten, this court again concludes that it need not resolve the issue of whether section 378-2 permits only aiding and abetting claims against individuals.[5]

EEOC Guidance concerning the ADA provides that an employer does not have to provide "personal use items needed in accomplishing daily activities both on and off the job."

---

[5]Consistent with governing precedent, Jura brings no federal discrimination claim against Acob and Kosegarten.  See Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002).

Enforcement Guidance: Reasonable Accommodation & Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335 at *4 (EEOC Guidance Oct. 17, 2002).  For example, "an employer is not required to provide an employee with a prosthetic limb, a wheelchair, eyeglasses, hearing aids, or similar devices if they are also needed off the job."  Id.

While a hearing aid is usually categorized as a personal use item, the EEOC Guidance also cautions that "items that might otherwise be considered personal may be required as reasonable accommodations where they are specifically designed or required to meet job-related rather than personal needs."  Id. However, an employer does not always have to provide the specific accommodation an employee desires.  The ADA only "requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy."  U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 397 (2002) (emphasis in original).  Therefore, the County could be required to reasonably accommodate Jura by providing a hearing aid if Jura required a hearing aid only in the courtroom or some other work-related setting, and if, absent a hearing aid, Jura was denied work opportunities afforded others.

Jura now wears a hearing aid "all the time" but previously wore no hearing aid at all.  Jura Dep. at 114, ECF No.

22

95-13.  She instead functioned by "read[ing] lips pretty well" and using "pretty developed masking skills, so [she] usually [could] figure out what somebody said."  Id.  It therefore appears that Jura was seeking accommodation only while in the courtroom.  But in the courtroom, the state court provided Jura with amplifying headphones.  The issue before the court is therefore whether the headphones still left Jura without the opportunities available to other attorneys in the courtroom.  See Barnett, 535 U.S. at 397.  If the headphones were insufficient to afford Jura equal work opportunities, then the County had a duty to provide more than the state court provided.

Jura says the headphones "restricted movement and necessitated having to pull [the headset] on and off to have quick sidebar conferences."  Am. Compl. ¶ 52.  At the hearing on the present motion, the court asked whether the headphones were wireless, and Jura's counsel indicated that he thought they were. It is not clear how wireless headphones "restricted movement." Because Jura provides no detail supporting that assertion, the court assumes that Jura's complaint is limited to the need to take the headphones off for certain purposes, presumably when people were not speaking directly into microphones, such as during bench conferences or conversations with opposing counsel. The court can easily understand that taking headphones off and putting them back on can be a nuisance, but Jura provides no

evidence that this created such a problem for her that it denied her the work opportunities available to others.  See Barnett, 535 U.S. at 397.  A hearing aid would eliminate the nuisance, but given the absence of detail from Jura and the lack of citation to law in this regard, the court cannot say that the state court's headphones were insufficient to qualify as a reasonable accommodation.

If Jura only needed accommodation in the courtroom, headphones could be economical, as they could presumably have been cleaned after each use and then used by others when Jura did not need them.  Jura does not explain why something more was needed for her to enjoy the same work opportunities as other attorneys in the courtroom.  Jura testified that whenever she had difficulty hearing the television, she would just turn up the volume.  The headphones appear to have performed that function for her in the courtroom.  Although there may well be circumstances in which such headphones do not constitute a reasonable accommodation, Jura does not, on the present record, demonstrate how she would meet her burden at trial of showing that the County violated the ADA by relying on the availability of the state court headphones.  While viewing the evidence in the light most favorable to Jura, the court concludes that the County is entitled to summary judgment on Jura's ADA claim.

The court might reach a different conclusion if presented with different facts.  Headphones might be inadequate for a criminal defense attorney if they prevented the attorney, while wearing headphones, from hearing a critical whispered question or remark from the defendant sitting next to the attorney.  That question or remark might provide material for cross-examining the witness whose testimony the attorney was listening to with the aid of headphones.  This would be particularly important if it were not feasible for the defendant to write a note to the attorney.

Because Jura does not present evidence of a need like the one in this court's hypothetical, the court grants summary judgment to the County on Jura's federal and state disability discrimination claims.  Because Jura does not show that Acob and Kosegarten failed to reasonably accommodate her hearing disability and makes no other disability-related assertions against them, the court also grants Acob and Kosegarten summary judgment with respect to Jura's section 378 disability claims.

> **4.   Summary Judgment is Denied in Part and Granted in Part on Jura's Retaliation Claims in Counts IV and V.**

Jura alleges in Count IV that the County, in violation of Title VII, retaliated against her for having engaged in protected activity.  <u>See</u> Title VII, 42 U.S.C. § 20003-3.  In Count V, Jura alleges that the County, as well as Acob and

25

Kosegarten, in their individual and official capacities, retaliated against her in violation of section 378-2(2) of Hawaii Revised Statutes.

With respect to Jura's retaliation claims against the County, federal and state law are analogous.  Gonsalves v. Nissan Motor Co., 100 Haw. 149, 163, 58 P.3d 1196, 1210 (2002).  With respect to Jura's retaliation claims against Acob and Kosegarten, Jura proceeds only under state law.  Because Jura does not establish the predicates for a retaliation claim, this court is able to decide the claims against Acob and Kosegarten without addressing the issue pending before the Hawaii Supreme Court as to what claims may be brought against individual employees.

For Jura to establish a prima facie case of retaliation under federal or state law, she must show that: (1) she engaged in protected activity; (2) she was thereafter subjected to an adverse action; and (3) a causal link exists between the protected activity and the adverse action.  See Wallis v. J.R. Simplot Co., 26 F.3d 885, 891 (9th Cir. 1994); Gonsalves v. Nissan Motor Co., 100 Haw. 149, 58 P.3d 1196, 1207 (Haw. 2002). The requisite degree of proof Jura must proffer to establish a prima facie case is "minimal."  See Cordovo v. State Farm Ins. Cos., 124 F. 3d 1145, 1148 (9th Cir. 1997); Gonsalves, 58 P.3d at 1210.

If a plaintiff asserts a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision.  See McDonnell Douglas Corp v. Green, 411 U.S. 792, 802 (1973).  If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.  Id.

### a.  Prima Facie Case

Jura claims that she engaged in protected activity when she participated in the internal investigation into Kosegarten's behavior.  Defendants challenge whether Jura's participation in the internal investigation qualifies as "protected activity" for the purpose of establishing a prima facie retaliation claim. Kosegarten urges the court to rely on McConnell v. Westpoint Stevens, Inc., 168 Fed. App'x 911, 914 (11th Cir. 2006), for the proposition that Jura must demonstrate both a subjective belief that her employer was engaged in unlawful employment activity and the objective reasonableness of that belief in light of the facts.  Kosegarten's counsel argues that Jura fails the objective reasonableness test because the investigation concerned alleged discrimination based on jealousy, not sex, and Title VII does not prohibit jealousy-based discrimination.

McConnell involved an employee who complained to her direct supervisors that another employee was being harassed by a

27

supervisor as the result of a failed relationship.  Id. at 913.

The court held that the employee in McConnell had not engaged in

statutorily protected activity because "the conduct alleged by

McConnell was not remotely close enough to support an objectively

reasonable belief that it constituted sexual harassment.

Instead, the supervisors' conduct towards [the other employee]

appears to have been motivated, at most, by personal animosity or

jealousy, and not sex."  Id. at 914.

Jura provided evidence in an internal investigation

generated by a charge Tate filed with an equal employment officer

within the Prosecutor's Office.  Title VII's anti-retaliation

provision specifically prohibits an employer from

"discriminat[ing] against" an employee or job applicant because

that individual "made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or

hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The

internal investigation was not a proceeding under Title VII and

so does not give rise to a Title VII retaliation claim.

Tate, like the employee in McConnell, alleged

discrimination based on a romantic relationship, not gender.

Tate's internal complaint, like the concern raised by the

employee in McConnell, was not the proper subject of a Title VII

claim.  The investigator, even if appointed to handle only

matters falling under Title VII, did not actually confine himself

to investigating discrimination on the basis of characteristics

covered by Title VII or any other employment discrimination

statute.   Instead, the investigator handled whatever required

investigation, even if Title VII issues were not implicated.

Thus, the investigator said:

> [W]hen somebody's dissatisfied, we can – – we
> can try to see what's going on.   And it may
> not necessarily rise to the level of an EEOC
> complaint, but it will rise to a level of
> something that we think requires some kind of
> investigation and see if we can better the
> situation or make sure that people are going
> to work well together.

Deposition of Robert Rivera at 71, ECF No. 120-2.   The

investigator understood that jealousy may have been the root of

the problem, see id. at 42, 57-60, 64-65, or that it may have

involved an appearance of impropriety even if he "didn't consider

it per se discrimination or an EEOC thing."   See id. at 49.   In

short, the investigation was not viewed even by the investigator

as involving a Title VII issue.

The court recognizes that Jura's situation differs

somewhat from that raised in McConnell.   The employee in

McConnell lodged a complaint with supervisors.   That employee

controlled the nature of the investigation.   By contrast, Jura

was a witness who spoke to the investigator about Tate's

complaint.   Jura had no control over whether Tate had made Title

VII claims or not.   A witness who participates in an internal

investigation and suffers retaliation as a result may well feel

29

even more aggrieved than a claimant who also suffers retaliation. However, feeling aggrieved does not necessarily mean one has a Title VII retaliation claim.

It appears that the investigator in the Prosecutor's Office might have investigated complaints going to many forms of interaction among employees.  Presumably, the investigator would have looked into an employee's complaint that another employee was bad-mouthing colleagues.  Absent any connection between that activity and a protected category, Title VII's retaliation provision would not have protected that complainant.  Title VII protects an employee who participates in "an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a)(emphasis added).  Jura does not show that she engaged in activity protected by Title VII by participating in the internal investigation.

Nor can Jura sustain a retaliation claim under section 378-2(2).  That statute makes it an unlawful discriminatory practice for any employer to discriminate against a person who "has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part."  The internal investigation was not a "proceeding respecting the discriminatory practices prohibited" by section 378-2.  Therefore, Jura could not be said to have engaged in protected activity for purposes of her state retaliation claim

30

against all Defendants, even assuming individual employees may be sued under section 378-2(2).

This court need nto address anything more with respect to Jura's retaliation claim because Jura fails to meet her minimal burden of making out a prima facie retaliation case under either federal or state law. The court nevertheless examines below the other parts of the burden-shifting analysis. Nothing the court says in that regard, however, can save Jura's retaliation claim.

### b. Legitimate, Nondiscriminatory Reason for the Adverse Employment Action

Defendants articulated a legitimate, nondiscriminatory reason for terminating Jura. The comments by Judges Loo and Polak qualify as nondiscriminatory reasons for Jura's termination.

### c. Pretext

Once Defendants articulate a legitimate, nondiscriminatory reason for firing Jura, the burden shirts back to Jura to show that the reason is a pretext for what is actually retaliation. As Jura points out, her "performance was thoroughly evaluated on September 13, 2007, by Defendants Kosegarten and Acob and she received very favorable ratings and comments." Pl.'s Opp. at 24. In November, Jura made allegations of discrimination and harassment against Kosegarten. Jura Decl.

31

¶¶ 95, 100.  Also in November, Acob requested feedback from Judges Polak and Loo regarding Plaintiff's performance.  Acob Decl. ¶ 6.  While Defendants requested feedback regarding the performance of all deputy prosecuting attorneys, Plaintiff's Questions for the Honorable Rhonda R. Loo at 3, ECF No. 120-6, it is not clear whether Jura's participation in the internal investigation affected Defendants' decision to seek feedback about Jura so soon after she had participated in the investigation.

If Jura had made out a prima facie retaliation claim, the court would examine whether the timing of the request for feedback from the judges raised a question of fact as to pretext with respect to Jura's federal and state retaliation claims against the County.  The court would also examine whether, assuming a retaliation claim under section 378-2(2) were allowed against Acob, there was at least a question of fact as to whether Acob had clearly acted with malice.  See Medeiros v. Kondo, 55 Haw. 499, 504, 522 P.2d 1269, 1271-72 (1974).  While not deciding those issues, the court does decide that Jura's retaliation claim against Kosegarten could not proceed even if Jura could be said to have made out a prima facie case, to be able to sue Kosegarten for retaliation under section 378-2(2), and to have raised a factual issue as to malice.

32

Jura alleges that Kosegarten harassed her during the summer of 2007 and harassed Murakami in September and October of that year.  <u>See</u> Jura Decl. ¶¶ 18-62, 76-91.  Jura also alleges that Kosegarten recommended that Murakami be terminated at a management meeting on October 27, 2007.  <u>Id.</u> ¶ 93.  Immediately following the management meeting, Tate filed his internal complaint against Kosegarten.  <u>Id.</u> ¶ 5.  It was not until November 6 and 23, 2007, however, that Jura was interviewed by the investigator about Tate's complaint.  <u>Id</u>. ¶¶ 95-96, 106-08.  To the extent Jura bases her retaliation claim on actions she says Kosegarten took before Jura's November interviews, any such actions by Kosegarten could not have been in retaliation for Jura's interviews.  While Kosegarten did take Jura off the work schedule after Jura's interviews, the evidence is undisputed that Kosegarten was following Acob's instructions.  It is also undisputed that Kosegarten lacked the authority to terminate Jura on her own.  Jura advances no evidence supporting a retaliation claim based on Kosegarten's actions.  Therefore, the retaliation claim against Kosegarten could not proceed even assuming there were no other bars to that claim.  Moreover, any retaliation claim against the County could not be based on Kosegarten's actions at the meeting on October 27, 2007.

Nor would Jura be able to proceed against Acob with a claim under section 378-2(3) even if there were no other bar to

that claim.  Section 378-2(3), which clearly does permit claims against individual employees, makes it an unlawful discriminatory practice for "any person, whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so."  Once Kosegarten is removed from the court's consideration for the reasons stated in the preceding paragraph, it is unclear who could have been aided, abetted, incited, compelled, or coerced by Acob into retaliating against Jura.  The statute, by its terms, requires Acob to have acted with another.  Acob cannot be held liable for having aided and abetted himself.  See Nowick v. Gammell, 351 F. Supp. 2d 1025 (D. Haw. 2004).  Although Jura alleges that the County's "agents" and "employees" played a role in retaliating against her, Am. Compl. ¶ 164, she does not meet her summary judgment burden of coming forth with evidence in that regard.

> **5.  Summary Judgment is Granted to Kosegarten on Jura's Libel and Slander Per Se Claim.**

Count VII of the Amended Complaint alleges that Kosegarten "made false and defamatory statements" about Jura.  Am. Compl. ¶ 177.  Kosegarten argues that Jura's claim fails because it falls outside the statute of limitations.

Pursuant to section 657-4 of Hawaii Revised Statutes, the statute of limitations for a defamation claim is two years.  See also Faaita v. Liang, 2009 LEXIS 89811 at *10 (D. Haw. Sept.

34

29, 2009).  The statute of limitations begins to run "when the defamee discovers or reasonably should have discovered the publication of the defamation."  <u>Hoke v. Paul</u>, 65 Haw. 478, 483, 653 P.2d 1155, 1159 (1982).

Jura complains that Kosegarten made a defamatory statement to Deputy Prosecuting Attorney Tracy Jones on or about August 25, 2009.  Jura's Dep. at 167-68.  According to Jura, Kosegarten referred to her and another former Deputy Prosecuting Attorney as "idiots" and "morons."  Jura alleges that she remembers the date, having reviewed an affidavit or statement from Jones.  <u>Id.</u> at 171-72.  Kosegarten argues, however, that Jura is mistaken about the date, explaining that "[t]he statement to which Plaintiff is referring states that the comment was made on or about August 6, **2008**, not August **2009**, and Ms. Jones informed Mr. Tate of Ms. Kosegarten's comments on or about August 14, **2008.**"  Kosegarten's Mot. for Summ. J. at 18 (citing Acob Decl. ¶ 2, and statement attached as Ex. A).  The court need not address this dispute over dates because, even if timely, Jura's defamation claims fail.

To prove defamation, Jura must establish the following: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) the publisher was negligent; and (4) either actionability of the statement irrespective of special harm, or the existence of special harm

caused by the publication." Wilson v. Freitas, 121 Haw. 120, 128, 214 P.3d 1110, 1118 (Ct. App. 2009). Whether a statement is defamatory depends on multiple factors, including "the temper of the times, the current of contemporary public opinion, and the result that words . . . may be highly damaging to reputation." Fernandes v. Tenbruggencate, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982).

Jura identifies two instances in which Kosegarten made allegedly defamatory statements. First, Jura claims that Kosegarten, in a conversation with Deputy Prosecuting Attorney Tracy Jones, referred to Jura as a "moron" and "idiot." See Jura Dep. at 167-68; Acob Decl. ¶ 2; Kosegarten's Mot. at Ex. A. These alleged comments could not reasonably be viewed as anything but a derogatory or insulting opinion as opposed to factual statements. An opinion may be unfounded, but falsity, which is the first element of a defamation claim, is simply inapplicable to an opinion. No reasonable person would have thought that Kosegarten was accusing Jura of being a moron or idiot as a matter of any actual medical diagnosis or evaluation.

Of course, an opinion is not always protected. Wilson v. Freitas, 121 Haw. 120, 128, 214 P.3d 1110, 1119 (Ct. App. 2009). This court notes that, in a case involving the press, the Hawaii Supreme Court adopted the Ninth Circuit's three-part test in determining whether a statement was false and defamatory under

36

the First Amendment.  Gold v. Harrison, 88 Haw. 94, 101, 962 P.2d

353, 360 (1997).  Under that test, a court considers:

> 1) whether the general tenor of the entire
> work negates the impression that the
> defendant was asserting an objective fact[;]
> (2) whether the defendant used figurative or
> hyperbolic language that negates that
> impression[;] and (3) whether the statement
> in question is susceptible of being proved
> true or false.

Id. at 101, 962 P.2d at 360.  The language attributed to

Kosegarten did not convey the impression that Kosegarten was

asserting an objective fact.  It clearly was figurative and

hyperbolic.  This court concludes that it was not defamatory.

Nor does Jura present any evidence of special harm

flowing from that alleged characterization.  See Restatement

(Second) of Torts § 575 (defining "special harm" as "the loss of

something having economic or pecuniary value").

Second, Jura contends that Kosegarten falsely suggested

in court documents that Jura had engaged in certain sexual

activity.  Jura Dep. at 173.  In general, statements made in the

context of judicial proceedings enjoy an absolute protection from

litigation.  See Matsumura v. E.I. du Pont de Nemours & Co., 102

Haw. 149, 154, 73 P.3d 687, 692 (2003) ("Hawaii courts have

applied an absolute litigation privilege in defamation actions

for words and writings that are material and pertinent to

judicial proceedings.").  Jura does not provide any basis for

deeming Kosegarten's alleged statements to be outside the scope

37

of the litigation privilege.  Even if the alleged statements were not privileged, Jura offers no evidence indicating that "special harm" resulted.  At most, she complains that Judge Polak inquired about whether Jura had an intimate relationship with a public defender.  There is, however, no evidence that the decision to fire Jura was in any way affected by that particular matter, or that Judge Polak's comments about Jura's courtroom performance would have been different absent Kosegarten's alleged statements. Jura's defamation claims with respect to both statements fail as a matter of law.

## V.       Conclusion

          For the foregoing reasons, the court grants Defendants summary judgment on all of Jura's claims.

          IT IS SO ORDERED.

          DATED: Honolulu, Hawaii, October 17, 2012.



          /s/ Susan Oki Mollway
          Susan Oki Mollway
          United States District Judge


Jacki Jura v. County of Maui et al., CIVIL NO. 11-00338 SOM/RLP; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT